Filed 8/29/25  P. v. Glover CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>LATEEFAH MIRIAM GLOVER,<br><br>　　　　Defendant and Appellant. | A169605<br><br>(Mendocino County<br>Super. Ct. No. 22CR02352) |

After the trial court found defendant Lateefah Miriam Glover violated the terms and conditions of her probation by committing two counts of battery against a security officer, the court reinstated her probation with the additional condition that she participate in a San Francisco treatment program.  She raises two claims on appeal—that the prosecution did not present sufficient evidence she committed battery against a security officer, and even if the evidence was sufficient, the additional requirement that she enroll in a treatment program in San Francisco violates her right to due process and is contrary to public policy.  We agree with defendant's first assertion and therefore do not reach her second.

1

## BACKGROUND[1]

In September 2022, Sergeant James Elmore of the Mendocino County Sherriff's Office responded to a call at a motel where employees were attempting "to get [defendant] to give up the room phone because she had been repeatedly dialing 911 for the entire day." Defendant had also opened one of the windows and thrown an open folding knife at one of the workers, striking him in the stomach. The worker was uninjured.

After a mental health specialist, who had been called to the scene to "de-escalate the situation," could not calm defendant, Sergeant Elmore attempted to speak to her through the open window. Defendant ran toward where Elmore was standing—by the window—"and pushed [his] arm attempting to close the window." She was holding a "metal pole from a, like, a clothes hanger" and saying, " 'Get away from my window. You guys aren't coming in here. I have been kidnapped.' "

Unable to close the window, defendant retreated back into the room, only to be met by deputies who had entered the room and were attempting to approach her. Defendant "redirected her attention" to the entering deputies and struck one, Deputy Christian Denton, with the metal pole. At that point, officers deployed a taser to effectuate an arrest.

About a month before the September incident, Deputy Denton had been called to the same location and had spoken with a woman employed there who had a "black right eye lid" and swollen "eyebrow area." The woman told Denton defendant had struck her when she attempted to stop defendant from taking bed sheets.

---

[1] The following factual background is taken from the preliminary hearing transcript.

Following the September incident, the Mendocino County District Attorney filed an information alleging two counts of felony assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)—counts 1 & 2);[2] one count of felony resisting an officer by force (§ 69, subd. (a)—count 3); felony second degree robbery (§ 211—count 4); and felony assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)—count 5).

Pursuant to a negotiated disposition, defendant pleaded no contest to counts 1, 2, and 3, in exchange for a sentencing lid of three years eight months, with execution of sentence suspended and placement on probation. At the change of plea hearing, counsel stipulated the preliminary hearing transcript provided a factual basis for the plea. The court then found defendant made a knowing and intelligent waiver of her rights and granted the prosecution's motion to dismiss the remaining counts pursuant to a *Harvey* waiver.[3] The court also found defendant had violated the terms and conditions of her probation in a trailing misdemeanor case (case No. 21-02721).

Before sentencing, the probation department submitted a presentence investigation report and recommendation. During an interview, defendant expressed her desire to engage in services via the Bay Area Community Services program and provided her probation officer with contact information for the representative at the program. The program provides "wrap-around services, including assistance with housing, substance abuse and mental health treatment." Defendant also expressed her desire to leave Mendocino County and move to the Bay Area. She had been living with her foster

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] *People v. Harvey* (1979) 25 Cal.3d 754.

3

mother, but "she could not bear to stay there much longer." Defendant stated she had been diagnosed with and suffered from "insomnia, schizoaffective disorder, bipolar disorder, and paranoia" and admitted she used "controlled substances" such as methamphetamines "as a coping mechanism." She had " '5150'd' herself" eight times over the years. She had been prescribed "Depakote, Zyprexa, Trazadone, and Seroquel" during her recent incarceration but stopped taking the medication upon her release from custody because she did not trust the "Redwood Quality Management Company." She also believed she was "being stalked" and had been kidnapped by the Mendocino County Sheriff's Office.

The probation department observed defendant had "demonstrated a consistent pattern" of failing to follow directives and refusing mental health services—"exacerbated by her drug use" and "jeopardizing her own safety and the safety of others." This, in turn, led to intervention by law enforcement, "who have very little recourse." Although "a prison commitment could easily be justified," the department recommended a grant of probation on condition defendant engage in the Bay Area Community Services program. The department had submitted a referral to the program, with the expectation defendant would be accepted by the time the court imposed sentence. This would allow defendant to enter the program, remain in the Bay Area, allow probation to transfer jurisdiction, and place defendant in "an environment where she is willing to engage in services, but also offer her dual-diagnosis treatment options that are not available in this county; with the hope of reducing her overall risk of recidivism."

The court sentenced defendant in accordance with the plea agreement and placed defendant on two years' probation, subject to several terms and

4

conditions, including that she obey all laws and be evaluated by a substance abuse specialist and a mental health specialist.

Less than two weeks later, the probation department filed a petition alleging a violation of probation, specifically that defendant had committed two counts of felony battery (§ 243, subd. (d)).

At the violation hearing, Alfredo Acevedo, a hospital security guard, testified he had been called to defendant's room to "help restrain" her so the staff could administer medication. Upon arrival at the room, defendant "tried fighting" staff, including four security guards. She was getting into an "aggressive stance," "ready to attack [them] with her fists," and saying she was "going to kick all our . . . asses" in an "aggressive tone of voice." Once Acevedo saw defendant take an "aggressive stance," the security personnel formed a plan to restrain her. Each was supposed to grab one of defendant's limbs, but one guard slipped. Defendant was "trying to swing at one of the other guards with her free arm." Once a guard was able to grab her right arm, defendant bit Acevedo. This broke the skin on Acevedo's arm, leading to bleeding, bruising and a scar, which Acevedo still had as of the time of the hearing.

Benjamin Harpe, another security guard, was called in to restrain defendant who was being "really combative" so that "medical staff could issue pharmaceutical restraints." Defendant was physically resisting by "throwing" her hands "around and, like, punches and scratching and biting." She scratched Harpe on the side of his face, making it bleed, and bit his shoulder, which left bruising but no permanent mark.

Both Acevedo and Harpe were in uniform, wearing blue button-up shirts with patches and badges identifying them as security officers.

On cross-examination, Acevedo stated he did not know why defendant was at the hospital. Harpe, in turn, stated he was not aware of why defendant was at the hospital "other than . . . being on, like, a behavioral health court hold." The prosecutor objected to Harpe's statement as hearsay and lacking foundation, and the trial court ruled it would not consider the statement for the truth of the matter but to explain Harpe's conduct in trying to restrain defendant.

The trial court subsequently observed that the petition alleged a violation of section 243, subdivision (d) (battery resulting in "serious bodily injury"), "but the evidence shows it's a [subdivision] (b)" (battery of a "security officer") case. Neither the prosecutor, nor defense counsel, took issue with the court's pronouncement and implicit finding that the battery had not resulted in "serious bodily injury" and thus did not come within section 243, subdivision (d), and that defendant's conduct, instead, appeared to fall within the ambit of section 243, subdivision (b), battery of a "security officer."

Defense counsel then argued section 243, subdivision "(b) requires that the individual is in the performance of their duties" and there was insufficient evidence of that. Counsel maintained that "[w]ithout knowing what was going on there, how [defendant] got there, why she was there, what medications were being legally administered, how can I say that these two individuals were in the performance of their duties without knowing that underlying. I mean, did somebody off the street drop her off there? Did law enforcement deliver her there? Did some social service agency deliver her there? I don't know any of that. [¶] And the reports are very silent on it. I saw a report in one instance where it said, well, it could have been . . . a [Welfare and Institutions Code section] 5150 situation. And then I also saw

6

that the [Welfare and Institutions Code section] 5150 hold was dropped. So I don't know why she's there and being restrained and being administered drugs. What it sounds like to me is she feels like she's being unlawfully restrained and is seeking to be not be restrained by any means possible. [¶] You can't, granted, use violence against words, and you're limited on the kind of violence you can use when violence is being applied to you. And being restrained is a violent act. And if she's responding in kind by the best she can. . . . She's 5' tall[4] and weighs 100 pounds on a good day."

The court responded, "I don't have any evidence that they were acting in excess or outside of their duties. What I have is both of them testifying that they work in hospital security. They were identified as hospital security by the clothes that they were wearing. And the evidence that I have is that they were assisting to restrain" defendant. Admittedly, the court did not "know why they were doing it. You're right, I don't have that information. But I do have that they were acting within their—the scope of their duties as security when they were injured in attempting to restrain [her]." The court closed by stating, "I appreciate your argument"; however, there was no evidence presented defendant was brought to the hospital "against her will" and the court could not speculate either way. Rather, the court had two "private security at a local hospital who, by the testimony I received today, were engaged in the performance of their duties when they were injured by [defendant]. . . . I don't have any evidence that they were acting outside of what their duties were."

The court then reinstated defendant's probation, subject to the additional condition that she participate in behavioral health court in San Francisco.

---

4   Defendant interjected that she was 4'9" tall.

7

There are many different categories of battery. Here, we are dealing with three: simple battery (§ 242); battery inflicting serious bodily injury (§ 243, subd. (d)); and battery on a security officer (§ 243, subd. (b)).

Simple "battery is 'any willful and unlawful use of force or violence upon the person of another.' (§ 242.) 'If, however, the batterer not only uses unlawful force upon the victim but causes injury of sufficient seriousness, then a *felony* battery is committed. For this second category of battery, "serious bodily injury" is required. (§ 243, subd. (d).)' " (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1147 (*Wade*).)

Subdivision (b) of section 243 prescribes a third category—battery against a peace officer or other specified person, including a "security officer." This subdivision provides, " 'If what would otherwise be a simple battery . . . is committed against, e.g., a peace officer engaged in the performance of his/her duties, then the offense is punishable by one year in county jail and a $2,000 fine.' " (*Wade, supra,* 204 Cal.App.4th at p. 1148, italics omitted; § 243, subd. (b).)

Here, the probation department filed a violation petition alleging defendant committed two counts of battery under subdivision (d) of section 243—that is, battery causing serious bodily injury. As we have recited, the trial court impliedly found there was insufficient evidence to support this allegation, but there was sufficient evidence to support a finding of battery under section 243, subdivision (b)—that is, battery of a security officer.

*Battery Causing Serious Bodily Injury*

" 'Serious bodily injury' " is defined in section 243 as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or

impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement."  (§ 243, subd. (f)(4).) Although Acevedo and Harpe testified defendant bit, punched, scratched, and kicked them, there was no evidence of any impairment of the sort identified in the statute.  Acevedo testified defendant broke the skin on his shoulder, leading to bleeding, bruising and a scar, which Acevedo still had.  Harpe testified defendant scratched the side of his face, making it bleed, and bit his shoulder, which left bruising but no mark.  While this evidence could suffice to support simple battery, the trial court correctly found it did not support a finding that defendant committed battery causing serious bodily injury under section 243, subdivision (d).

> *Battery of a Security Officer*

Section 243, subdivision (b) prohibits battery against, among others, a "security officer" "in the performance of their duties" when the "person committing the offense knows or reasonably should know" the victim is a security officer "engaged in the performance of their duties."

What the trial court, prosecutor, and defense counsel all overlooked is that section 243 also expressly defines " '[s]ecurity officer,' " and it does not mean any person wearing insignia that he/she/they is part of a "security" detail.  Rather, section 243, subdivision (f)(14) defines " '[s]ecurity officer' " to mean "any person who has the responsibilities and duties described in Section 831.4 and who is employed by a law enforcement agency of any city, county, or city and county."[5]

Neither Acevedo nor Harpe testified they were employed by a law enforcement agency or had the responsibilities and duties described in

---

[5]  Section 831.4 provides, in pertinent part: "A sheriff's or police security officer is a public officer, employed by the sheriff of a county, a police

section 831.4. Indeed, Harpe testified he was employed by "Allied Universal Security Services" at Adventist Health Hospital Ukiah Valley.

In short, the trial court, without objection by either the prosecutor or defense counsel, went down the wrong analytical road in finding defendant committed battery on a "security officer" under section 243, subdivision (b).[6]

*Simple Battery*

Given the state of the record and the error by the trial court in finding defendant committed battery on a "security officer," we requested supplemental briefing as to the impact thereof on defendant's appeal.

---

chief of a city police department, or a police chief of a police division that is within a city department and that operates independently of the city police department commanded by the police chief of a city, whose primary duty is the security of locations or facilities as directed by the sheriff or police chief. The duties of a sheriff's or police security officer shall be limited to the physical security and protection of properties owned, operated, controlled, or administered by the county or city, or any municipality or special district contracting for police services from the county or city pursuant to Section 54981 of the Government Code, or necessary duties with respect to the patrons, employees, and properties of the employing county, city, or contracting entities." (§ 831.4, subd. (a)(1).)

[6] We note that as of January 1, 2025, section 243, subdivision (b) also prohibits battery against a "health care worker" and provides, in pertinent part: "When a battery is committed against . . . a physician or nurse, other health care worker of a hospital engaged in providing services within the emergency department, and the person committing the offense knows or reasonably should know that the victim is . . . a physician, nurse, or other health care worker of a hospital engaged in providing services within the emergency department, the battery is punishable by a fine note exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment." Pursuant to section 243, subdivision (f)(15), " 'Health Care Worker' " is defined as "a person, who in the course and scope of employment, performs duties directly associated with the care and treatment rendered by the hospital's emergency department or the department's security." However, there is no evidence in the record that defendant was in the emergency department.

10

The Attorney General urges that even if the evidence is insufficient to establish a violation of section 243, subdivision (b), it is sufficient to establish simple battery (§ 242) or simple assault (§ 240), lesser included offenses of battery on a security officer that suffice to sustain the finding that defendant violated the terms and conditions of her probation. (See *People v. Bechler* (1998) 61 Cal.App.4th 373, 378–379; *People v. Yonko* (1987) 196 Cal.App.3d 1005, 1010 ["[W]here the evidence is insufficient to sustain the offense charged but shows that the defendant is guilty of a lesser included offense . . . , the court may reduce the crime rather than reverse outright."]; see also *People v. Ortega* (1998) 19 Cal.4th 686, 692 [" 'where an offense cannot be committed without necessarily committing another offense, the latter is a lesser included offense' " within the former], disapproved other grounds in *People v. Reed* (2008) 38 Cal.4th 1224, 1228–1229, 1231.)

Defendant maintains—as she did in her opening and reply briefs—that "there was insufficient evidence presented . . . that [she] did not act in lawful self[-]defense." Specifically, given the absence of any evidence as to why she was hospitalized, let alone, of authority for hospital medical staff to involuntarily medicate her, she was entitled to raise the issue of self-defense. And "[u]nder those circumstances," defendant asserts, she "had the right to use proportional force to defend herself from that attack" and thus did not commit "even a simple battery."

The prosecution always bears the burden of proving, by a preponderance of the evidence, an allegation that a defendant has violated the terms and conditions of their probation. (*People v. Buell* (2017) 16 Cal.App.5th 682, 687.) The threshold elements the prosecution was required to prove here were whether defendant employed "any willful and unlawful use of force or violence upon the person of another." (§ 242.) "Only

11

a slight unprivileged touching is needed to satisfy the force requirement of a criminal battery." (*People v. Ausbie* (2004) 123 Cal.App.4th 855, 860, fn. 2, disapproved on other grounds in *People v. Santana* (2013) 56 Cal.4th 999, 1011, fn. 6.)  There is no question that the record here amply supports the "slight touching," i.e., the force, requirement.

However, as defendant argues, there is an additional aspect of battery as to which the record here is wholly silent, namely self-defense, which is a legal justification for the commission of a battery.  (CALCRIM No. 3470 [instructing on self-defense as a defense to battery].)  CALCRIM No. 3470 spells out the defense as follows: "Self-defense is a defense to [battery].  The defendant is not guilty of battery . . . if (he/she) used force against the other person in lawful (self-defense/ [or] defense of another).  The defendant acted in lawful (self-defense/ [or] defense of another) if: 1. The defendant reasonably believed that [she] was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]; [¶] 2. The defendant reasonably believed that the immediate use of force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger."

Thus, "[t]o justify conduct that would otherwise be an assault on grounds of self-defense, a defendant ' "must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him [or her]." ' (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064. . . .)  'In other words, the defendant's belief must both subjectively exist and be objectively reasonable.' (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014. . . .)  'The threat of bodily injury must be imminent.' (*Minifie*, at p. 1064.)  Moreover, ' "any right of self-defense is limited to the use of such force as is reasonable under the circumstances." ' (*Id.* at p. 1065, citing Civ. Code, § 50 ['Any necessary force

12

may be used to protect from wrongful injury the person . . . of oneself'].)" *People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 212 (*Cruz-Partida*).)

And where the defendant legitimately raises the issue, "[i]t is the prosecution's burden to prove beyond a reasonable doubt [or, as here, by a preponderance of the evidence] that the defendant did not act in lawful self-defense. (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1429. . . .)" (*Cruz-Partida, supra,* 79 Cal.App.5th at p. 212.)

We understand that defendant's apparent mental illnesses or impairments are not to be taken into account in determining whether she had an objectively reasonable belief that bodily injury was about to be inflicted on her. (See *People v. Brady*, *supra*, 22 Cal.App.5th at pp. 1017–1018; *People v. Jefferson* (2004) 119 Cal.App.4th 508, 519; *Cruz-Partida, supra,* 79 Cal.App.5th at p. 212.) Rather, the "reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require." (*Jefferson,* at p. 519.)

Here, the *only* evidence in the record is that defendant was in a hospital room, medical personnel were attempting to medicate her, defendant was resisting, and the two security guards were called into the room to hold defendant down so the medical personnel could complete their mission. In the absence of *any* other evidence, we can only conclude any reasonable person would, in these circumstances, have concluded they were about to suffer "bodily injury," namely, they were about to seized and forcibly medicated. The evidence fell short, in other words, because there was zero evidence defendant could lawfully be involuntarily medicated or had, herself, authorized the medical treatment to which she was about to be subjected. (Cf. *In re Qawi* (2004) 32 Cal.4th 1, 14 [the constitutional right to refuse medical treatment "clearly extends to the right to refuse antipsychotic

13

drugs"]; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1320 ["absent a judicial determination of incompetence, antipsychotic drugs cannot be administered to involuntarily committed mental patients in nonemergency situations without their informed consent"], abrogated by statute on another ground as stated in *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1104.)

In sum, neither the prosecution nor the defense raised any objection to the trial court's misdirected assessment of the probation violations alleged against defendant, which resulted in the court erroneously finding that she committed two counts of battery on a security officer under section 243, subdivision (b), a statutory provision which is simply inapplicable to the incident that occurred here. Nor did the prosecution introduce any evidence—namely, evidence that defendant could be forcibly medicated—to support a finding that she was not acting in self-defense and thus allowing this court to conclude that, while the evidence is insufficient to support a finding that she committed battery on a security officer under section 243, subdivision (b), it is sufficient to support a finding that she committed the lesser offense of simple battery.

We are therefore left with no choice but to reverse the trial court's order that defendant violated the terms and conditions of her probation.[7]

## DISPOSITION

The order is REVERSED.

---

[7] We therefore need not, and do not, reach defendant's claim that requiring her to participate in the San Franciso treatment program violated her constitutional rights.

14

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Smiley, J.

A169605, People v. Glover

15